SAVOY, Judge.
This is a suit for personal injuries and damages arising out of an automobile-motorcycle accident that occurred July 6, 1968, on Louisiana Highway No. 6 about two miles west of Natchitoches. Plaintiff was riding his Harley Davidson motorcycle and was injured when it collided with the rear of a 1965 Ford Mustang automobile *566 being driven by defendant, Robert Mitchell. The Mustang was covered by a liability insurance policy with defendant, Travelers Indemnity Company.
After a trial on the merits, the district court rendered judgment in favor of plaintiff, awarding him $6,596.25, plus legal interest, with the liability of Travelers Indemnity Company being limited to $5,450.-00, plus legal interest. From this judgment, defendants have filed an appeal to this Court, and plaintiff has filed an answer to the appeal.
The issues raised on appeal are those of negligence, contributory negligence and quantum.
The record shows the accident occurred at about 5:30 P.M. on July 6, 1968, on Louisiana Highway No. 6 about two miles west of Natchitoches. The highway in the general area was paved with blacktop, about 24 feet in width, and the speed limit was 60 miles per hour. The area is hilly, but where the accident occurred the road was level and straight a distance between two curves, and there was a zone for passing of about 100 yards in length. At the time of the accident, it was daytime, the weather was clear, and the highway was dry.
Defendant, Robert Mitchell, was driving the Mustang in an easterly direction towards Natchitoches, with his wife as a passenger. Plaintiff entered the highway on his motorcycle after the Mustang passed and followed the car for about 14 mile before the accident occurred.
Plaintiff’s version is that he was following the Mustang at a speed of about 40 to 45 miles per hour; that he began a passing maneuver by pulling to the left and increasing his speed to about 55 miles per hour; that the Mustang then made a sudden movement to the left, going into the left lane; that he applied his brakes and swung back to the right lane; that he then tried to pull to the left again; but, by that time, he was too close and his motorcycle started to slide, and slid sideways into the rear of the car. He stated the right side of his motorcycle struck the rear bumper of the car on the left side. He estimated that the car was only about two to three car lengths ahead when it cut into the left lane in front of him. He testified the point of impact was in the center of the highway, with his motorcycle sideways, its front on the left side of the road, and its rear end on the right side of the road. His motorcycle came to rest in the middle of the road.
Mitchell’s version of the accident is that he was proceeding at about 40 miles per hour; that he saw the motorcycle behind him and then forgot about it; that he hit something in the road and thought he had a bad tire; he slowed and gave a right turn signal, although he was not sure how soon he did; he applied his brakes; that the first indication he had of the accident was when it occurred. He denied that his car ever crossed over the center line. He did not know what his car hit in the road, but thought it was possibly a bump or hole in the highway. He was not asked and did not tell the investigating trooper about hitting something in the road. He thought the car was at an angle with all four wheels still on the road at the time of the accident. He testified that the motorcycle struck his rear bumper just to the left of center.
Mitchell’s wife testified she noticed the motorcycle by the road as they passed, but she did not notice it behind her and her husband. She didn’t notice anything unusual or hear anything. She testified her husband said he thought the tires were low, that he slowed and turned on his blinker. She did not realize an accident was going to occur until it happened. She thought the car was turning and partly off the highway when it was struck. She de *567 nied that it ever crossed over the center of the road.
Joseph Ivy, a friend of plaintiff, witnessed the accident from the driveway of his parents’ home. He testified he noticed the Mustang and the plaintiff on his motorcycle pass by on the highway and saw the accident as it occurred at a distance of about 500 feet. He testified he did not see any signal given by the Mustang, which slowed down real fast and then started to make a left turn or a “U” turn, although he could not quite tell which. He testified the Mustang did turn left with its wheels going across the center line. He saw plaintiff was attempting to pass, and it seemed to him that both the Mustang and the motorcycle turned right at the same time. The motorcycle then slid into the rear of the car as it had possibly one wheel off on the shoulder of the road. He testified he thought the two vehicles slowed from about 40 to 45 miles per hour to about 25 miles as they passed by him, and that the car was only going about 10 to 15 miles per hour when it turned to the left across the center line. He stated that the investigating officer only asked for a brief description of the accident, which he gave him.
The state trooper who investigated the accident, Sgt. Robert Arthur, testified that the point of impact was located in the middle of the eastbound lane of traffic. He found slide marks, as opposed to skid marks, left by the motorcycle of approximately 45 feet in length, which angeled slightly from the south side toward the center of the road to the point of impact. The Mustang was struck just left of center on its rear bumper by the right side of the motorcycle. The car' came to rest facing back almost toward the west with its left front portion over the shoulder of the highway. Plaintiff had been taken to the hospital when Sgt. Arthur arrived at the scene of the accident, so he questioned Robert Mitchell and the witness, Joseph Ivy. He testified that Ivy only told him that the Mustang was slowing down, and did not say anything about a “U” turn.
The district court, without assigning written reasons, found that the sole and proximate cause of the accident was the negligence of Robert Mitchell. In so doing, the court accepted plaintiff’s version of the accident and rejected the defendant’s version. This Court should not reverse the findings of fact made by the trial court unless manifestly erroneous. This rule is especially applicable in cases such as this one, where there are two conflicting versions as to how the accident occurred. By observing the witnesses as they testify, the trial court is in a better position to make a determination as to the credibility of the witnesses than this Court can by reviewing a written record.
After reviewing the record and giving careful consideration to the arguments raised in appellants’ brief, we find there is ample evidence to support the findings of the district court, and we find no manifest error in the district court’s acceptance of plaintiff’s version of the accident. Although there are some inconsistencies in the testimony of plaintiff as compared to that of his witness, Ivy, nevertheless, that witness substantiated the testimony of plaintiff that Robert Mitchell turned the Mustang across the center line of the road into the path of the overtaking motorcycle thereby causing the ensuing accident. Under this version of the accident, the record shows that plaintiff made a timely and reasonable effort to avoid the accident under the circumstances, but because of the subsequent action of Mitchell in turning back to the right, he was unable to avoid hitting the forward car. Accordingly, we will affirm the holding of the district court as to the liability of defendants.
The final issue for our consideration is whether or not the award granted *568 to plaintiff should be increased or reduced. The plaintiff was thrown from his motorcycle by the accident and rendered unconscious for a brief time. When he came to, he found himself in the highway in pain, with his right leg folded under him and bleeding. He was also bleeding from the mouth and head, and had other cuts, bruises and abrasions. He was taken by ambulance to a hospital in Natchitoches where he was treated by Dr. Davis T. Henry, a general practitioner.
Dr. Henry examined plaintiff and found him to have fractures of both bones in his right lower leg, a laceration of the right forehead which had bled profusely but had ceased to bleed at that time, and numerous other bruises and contusions. He sutured the laceration of the forehead. Because the plaintiff had sustained multiple trauma in general areas, there was a possibility of internal injuries or other complications, and the doctor felt the treatment of the fracture could best be appraised by an orthopedic surgeon, so he referred him by ambulance to Dr. Carl G. Goodman, an orthopedic surgeon of Shreveport. After plaintiff’s return from Shreveport, he was again admitted to the hospital in Natchi-toches on July 10, 1968, because of complications of ill feelings, fever, difficulty in breathing, and coughing up of blood. The ultimate diagnosis was that plaintiff had developed bilateral broncho-pneumonia which had resulted indirectly from the accident because of his convalescence and inability to be very active. Plaintiff was discharged from the hospital on July 17, 1968. Dr. Henry examined plaintiff at the time of the trial on March 11, 1969, and found him to still have residual disability of the leg, with obvious atrophy. He could not determine whether or not residual disability would be permanent. He described the pain of plaintiff on the day of the accident as moderately severe, and the pain in his chest later as severe. Dr. Henry also testified that plaintiff had some evidence of mild liver damage at the time he was hospitalized for pneumonia, which was likely caused by trauma.
Dr. Carl G. Goodman, an orthopedic surgeon in Shreveport, saw plaintiff about 10:00 P.M. on July 6, 1968, in the hospital in Shreveport. He found plaintiff to have a comminuted fracture of the distal one-third of the right tibia and fibula. After manipulation of the fracture, he placed plaintiff’s right leg in a long leg cast, and admitted him to the hospital for observation, discharging him July 8, 1968. He saw plaintiff July 19, 1968, at which time the cast was changed and another long leg cast with a walking heel was added, after manipulation of the fracture to correct a slight angulation. On September 14, 1968, he again placed plaintiff in a long leg cast with a walker to allow healing to progress. On November 16, 1968, he decided to leave plaintiff out of plaster; he removed the cast and placed plaintiff on crutches. On November 18, 1968, plaintiff was having difficulties, and the doctor placed him in a patella tendon bearing type plaster cast for a period of a month. On January 6, 1969,, the doctor found the X-rays showed good healing of the fractures, although plaintiff complained of discomfort on full weight-bearing and some stiffness in his ankle. It was Dr. Goodman’s opinion that plaintiff would eventually make a complete recovery without any disability.
The record shows that although plaintiff was still having considerable pain and difficulty, he returned to his work at a desk job after only two weeks from work. His employer paid his full wages for the time he was off work. The district court made no award for loss of wages. The award granted was $5,000.00 for general damages, $1,146.25 for medical expenses, and $450.00 for property damages, totalling $6,596.25. The record substantiates the special damages as awarded.
Considering the recent awards for similar injuries as received by plaintiff, this Court finds the amount of $5,000.00 for *569 general damages to be on the low side, but within the wide range of discretion afforded the district court. Accordingly, we find the district court did not abuse its discretion, and hold that the award granted the plaintiff was neither excessive nor inadequate.
For the reasons assigned the judgment of the district court is affirmed. All costs of appeal are assessed against defendants.
Affirmed.
HOOD, J., dissents and assigns written reasons.